UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES

       -against-                                                 22 CR 092 (RA)

LUIS CRUZ
-------------------------------------------------------x


## LUIS CRUZ'S
## SENTENCING MEMORANDUM


Deborah Colson
Moskowitz Colson Ginsberg & Schulman LLP
80 Broad Street, Suite 1900
New York, N.Y. 10004

*Attorney for Luis Cruz*

I.

INTRODUCTION

Many people make their worst mistakes early in life, but the trajectory of Mr. Cruz's life has been quite the opposite. In his early adult years, Mr. Cruz was disciplined, determined, and dedicated to building his business and raising his children. Once he reached middle-age, however, Mr. Cruz faced major setbacks that turned his life upside down. Having struggled with substance abuse for decades, in the years preceding this offense, Mr. Cruz became seriously addicted to heroin, and his "ability to think critically and make good decisions was profoundly impaired as a result of his addiction." Ex. A at 7.

The Probation Department's recommendation of 90 months' incarceration is significantly "greater than necessary" to achieve the goals of sentencing. Mr. Cruz was a low-level player in the drug trade who sold to other users like himself. In contrast with the two defendants already sentenced, he has no prior criminal record, and he understands the seriousness of his offense and the harm it caused his community. Mr. Cruz is a high-school graduate and trained electrician who installed and maintained wiring systems in his Williamsburg community for years. He stopped working and became addicted to heroin after a hip injury, which eventually required double hip replacement surgery. He began selling drugs around the same time to support his habit and pay his bills. Because his crime was motivated by drug use, common sense dictates that substance abuse treatment is the best way to minimize his risk of recidivism, and he is more likely to receive consistent, long-term treatment in the community than in prison.

Mr. Cruz has already spent nineteen months in detention subject to unduly harsh conditions of confinement marked by frequent and extended lockdowns. Given his lack of

criminal record, lengthy work history, and need for treatment, we ask the Court to impose a sentence of time served with a requirement of drug counseling.

## II.

## MR. CRUZ'S PERSONAL HSTORY AND CIRCUMSTANCES

Born in Puerto Rico and raised in Brooklyn, Mr. Cruz credits his parents for their strict discipline and commends their efforts to shelter him and his siblings from the drugs and violence endemic of South Williamsburg in the 1980s and 90s. At the time of his arrest, Mr. Cruz still lived in the same two-bedroom apartment where he grew up, his parents in one room and their three children in the other. His father was a bus operator for the MTA, and his mother took care of the home. PSR ¶¶ 66-7. The family lived modestly, but Mr. Cruz's basic needs were met, and he had loving relationships with his parents and siblings.

Mr. Cruz attended public school in Brooklyn where he excelled academically, especially in his younger years. He spent the summers with extended family in Puerto Rico, camping, fishing and playing outside. As a teenager, Mr. Cruz gravitated toward vocational courses and elected to attend the Eli Whitney Vocational School, graduating in 1986. PSR ¶ 80. After high school, he received a scholarship to the Academy of Aeronautics where he completed two semesters before deciding to pursue a career as an electrician. *Id.* at ¶¶ 81-82. In 1989, he enrolled in an apprenticeship course at Pratt Institute and graduated six months later as a certified electrician. *Id.* at ¶ 82.

Mr. Cruz began a relationship with Margie Lopez in his late 20s and they had three children together, Luis (age 27), Kayla (age 24), and Marissa (age 22). PSR ¶ 69. He and Margie separated in 2003 but continued co-parenting their children. At the time of his arrest, their son Luis lived with him, and their daughters Kayla and Marissa lived with Margie. In their letters to

the Court, Margie and her daughters recall happy times together as a family, taking vacations and spending time outdoors. Margie writes about their visits to Puerto Rico and Lake George. Ex. C. Marissa remembers being carried on her father's shoulders and playing in the snow. Ex. D. And Kaila explains that her father taught her to be generous with her friends and "take care of the people that surrounded me." Ex. E.

Mr. Cruz also has close relationships with his neighbors and others in the Williamsburg community. Neighbors Ulpialinda Baez and Ana Seda grew up with Mr. Cruz and have each know him for more than fifty years. Ana describes their community as "tight knit" and remembers the families sharing Thanksgiving, Christmas and New Year's together. Ex. F. Ulpialinda writes that Mr. Cruz is a "good decent family man" and that he would help older adults in the building, including her father who suffered from dementia. Ex. G. Ulpialinda explains that her father would sometime wander off and that "Luis would physically carry him back to the apartment." *Id*.

    A.   Career as an Electrician

Mr. Cruz began his career as an electrician when he was just twenty-years old, working for various companies and contractors until striking out on his own in 2001. PSR ¶ 84. For fifteen years after that, he worked in South Williamsburg and built his business through word of mouth. Those closest to Mr. Cruz call him "Monstro" (meaning Monster) due to his extraordinary talents, a label he wore proudly for many years. Roily Bourdierd, who owns a local meat market, describes Mr. Cruz as "one of the most respected electricians in the w[hole] neighborhood" and says that Mr. Cruz did multiple jobs for him, both at his business in Brooklyn and his home in the Bronx. Ex. H. Mr. Cruz's sister Sandra also remarks on her brother's skill

3

and experience. She recalls a time when the whole block lost electricity due to a blackout and he was "able to go downstairs and fix it for his building." Ex. A at 4.

In 2016, Mr. Cruz got a full-time job for Warren Johnson Electric, a licensed and insured company based in Queens. PSR ¶ 83. He remained with the company for the next three years. The owner, Mr. Johnson writes that Mr. Cruz was "good at his job and customers loved him." Ex. I. "In fact," Mr. Johnson adds, "if you asked anyone in the neighborhood about his character, they would only have good things to say. He is an honest man who comes from a good family and he is friendly and kind." *Id.*

    B. <u>Drug Addiction</u>

In connection with plea negotiations, the defense retained Dr. Sasha Bardey to conduct a forensic psychiatric evaluation. *See* Ex. A. Based on interviews with Mr. Cruz, discussions with family members, and a review of the discovery, Dr. Bardey concludes that Mr. Cruz meets the criteria for opioid use disorder, stimulant use disorder and cannabis use disorder. Ex. A at 6. He further opines that, "at the time of the offense, Mr. Cruz's mental state was characterized by several co-occurring substance use disorders, the symptoms of which significantly impacted on his thinking, judgment, and decision-making." *Id.* at 7. Dr. Bardey believes that Mr. Cruz could achieve "long-term management of his substance abuse addictions" through "long-term and closely monitored substance abuse treatment." *Id.*

Mr. Cruz reported to Dr. Bardey that he first experimented with marijuana, LSD and crack cocaine as an adolescent. Ex. A at 6. According to Dr. Bardey, Mr. Cruz's "early introduction to illicit substances laid the foundation for ongoing and worsening substance abuse in subsequent years." *Id*. As he reached his thirties and began raising a family, Mr. Cruz transitioned to alcohol, heroin and cocaine. *See id.* His relatives speak honestly about his

4

substance abuse and its impact on the family. Marissa in particular says that her father drank beer "like it's water" and that, as she grew older, she could tell he was always intoxicated. Ex. A at 5.

Mr. Cruz became seriously addicted to heroin in 2017 or 2018. His decades of work as an electrician had started to take a toll on his body, and he began experiencing chronic hip pain. By 2019, the pain was so severe that he could no longer work. His injury only pushed him further toward an addictive lifestyle. In the months prior to his first surgery in 2020, walking down the steps from his second-floor apartment became nearly impossible, and he had to rely on his son and other young men from the neighborhood to bring him groceries and other necessities.

Eventually, Mr. Cruz had both hips replaced. By this point, however, he was already snorting heroin daily and had resorted to selling heroin to support his habit. To make matters worse, recovering from two major surgeries proved extremely difficult. Mr. Cruz acknowledges now that he spent days at a time sitting in his living room, watching television, drinking beer, and snorting heroin. He gained weight, which exacerbated his condition.

Dr. Bardey explains that "chronic substance abuse causes enduring neurobiological changes in brain structure, directly resulting in impaired cognitive functioning, judgment, memory and concentration." Ex. A at 6. He adds that, as Mr. Cruz's addiction "took hold of his life," he broke connections with family and friends, and "his social circle and daily activities began to revolve around his substance use." *Id.* "Surrounded by acquaintances who were also involved in drug use and sales, Mr. Cruz's ability to think critically and made good decisions was profoundly impaired as a result of his addiction." *Id.* at 7.

Mr. Cruz has never received the benefit of substance abuse counseling. He acknowledges the negative impact that addiction has had on his life and expressed to Dr. Bardey his desire to participate in long-term treatment. Ex. A at 6.

## III.

## MR. CRUZ'S ROLE IN THE OFFENSE

Mr. Cruz sold handfuls of glassines to individual customers for their personal use. He was not a leader of the conspiracy and did not earn significant profits. While some drug dealers are motivated by greed, Mr. Cruz sold drugs because of his addiction. "I sold to support my habit and pay my bills," he writes. Ex. B. "This is no excuse, but it is the truth." *Id.* "It was a terrible mistake in judgment." *Id.*

Under the terms of his plea agreement, Mr. Cruz has agreed that his offense involved more than four but less than twelve kilograms of fentanyl. PSR ¶ 5(a)(ii). Importantly, however, the agreed-upon drug amount is not based on his individual sales. It constitutes the government's best estimate of sales made by the entire crew during the charged conspiracy. It also bears noting that law enforcement made a deliberate decision to conduct multiple undercover purchases from the crew between February 2021 and January 2022 instead of arresting them after their first or first several sales.

Mr. Cruz has also stipulated to maintaining a premises for the purpose of distributing drugs. PSR ¶ 5(a)(iv). While he meets the criteria for this enhancement, he did not "maintain" the 3rd Street apartment solely in order to sell heroin. His parents first rented the apartment when Mr. Cruz was a child, and he has lived there nearly fifty years. He sold from the apartment because he was too disabled to stand on the street.

Further, Mr. Cruz played no role in lacing the drugs with fentanyl. After Mr. Williams' death, he should have known that heroin obtained by the crew had been laced. But he clearly never processed the risks involved with fentanyl as he consumed the very same drugs he sold.

## IV.

## MR. CRUZ MERITS A SENTENCE OF TIME SERVED

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 562 U.S. 476, 491 (2011); *see also United States v. Sloane*, 308 F.R.D. 85, 87 (E.D.N.Y. 2015) ("In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized.").

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 562 U.S. at 487 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 552 U.S. 38, 49-50 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 50.

Among the factors to be considered are: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just

7

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

Several of those factors warrant the Court's leniency here.

A. <u>A Time-Served Sentence is Necessary to Avoid Unwarranted Disparities in Sentencing</u>

First, a lengthy prison term would create unwarranted disparities in sentencing. The instant indictment charged four defendants including Mr. Cruz, two of whom have already been sentenced. Irving Cartegena received a sentence of 120 months for causing Michael William's death. Carlos Macci, a street-level dealer, was sentenced to thirty months. Mr. Cruz and Hector Robles are both scheduled to be sentenced on October 10, 2023.

In contrast to Mr. Cruz, Cartegena and Macci both have lengthy criminal records. Cartegena has fifteen convictions, including his conviction in this case; his prior crimes involved drugs, illegal appropriation, aggravated damages, burglary, robbery, and prison escape. *See* Dkt No. 64 at 7. Macci has sold drugs for decades. *See* Dkt No. 58 at 4. He has over twenty prior convictions and has served several terms of incarceration. *See id.* at 5. In short, both Macci and Cartegena have been enmeshed in criminal activity for most of their adult lives.

Mr. Cruz has no prior criminal record and has never served time in prison. He began selling drugs in late middle age upon becoming severely addicted to heroin after a hip injury left him unable to work. Unlike Cartegena, he has not had the benefit of drug treatment. And unlike both Macci and Cartegena, he received the safety valve for his detailed and honest proffer with the government about his involvement in the offense. A time served sentence based on these "legitimate individualized sentencing concerns" would be perfectly appropriate. *United States v. Ovid,* O9 Cr. 216 (JG), 2010 WL 3940724 at *9 (E.D.N.Y. Oct. 1, 2010); *United States v. Ebbers,*

458 F.3d 110, 129 (2d Cir. 2006) (a "reasonable explanation of the different sentences" is sufficient).

B. <u>The Unduly Harsh Conditions of Confinement at Essex County Correctional Facility and the MDC Warrant Leniency</u>

Second, the Court should consider Mr. Cruz's conditions of confinement. Mr. Cruz was arrested on February 1, 2022, during the Omicron surge and spent sixteen months at the Essex County Correctional Facility before being transferred to the MDC on June 1, 2023. The Court is well aware of the harsh conditions endured by inmates at each of the local federal jails. But Essex, in particular, has been a pressure cooker fueled by constant lockdowns, staff shortages, the suspension of social and legal visits, and an increase in violence among inmates. In December 2021, an inmate was charged in the stabbing death of a fellow prisoner. MattKatz, *Violence And The Death Of One Inmate At Newark's Jail Reflects A National Problem*, Gothamist (Dec. 9, 2021), available at: https://gothamist.com/news/violence-and-the-death-of-one-inmate-at-newarks-jail-reflects-a-national-problem. This occurred just weeks after another prisoner was beaten so severely that he ended up in a coma. *Id.* Earlier in 2021, a corrections officer was charged with assaulting an inmate who squirted liquid on him. Apparently, three other officers failed to intervene and stop the attack. *Id.* Most inmates at Essex keep to themselves, but they are punished for others' misconduct. The restrictions imposed to prevent the spread of violence have been arduous. Fortunately, Mr. Cruz spent most of his time at Essex in the dormitories. However, even that unit was on lockdown during his confinement there.

Mr. Cruz has not fared much better at the MDC. While the COVID-related restrictions have long been lifted, conditions at the facility remain harsh and frankly inexcusable. Staffing shortages and gang violence result in frequent and extended lockdowns. Too often, inmates are confined to their cells without access to showers, phones, computers, televisions, or recreational

9

areas. The lack of appropriate medical care and poor hygiene are also well documented. S*ee, e.g., United States v. Boyd*, 21 Cr. 486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022) (noting staffing issues, lock downs and lack of access to counsel at the MDC); *New York pols rally outside MDC-Brooklyn to demand federal oversight*, ABC News (Aug. 16, 2022) ("Whether it's lack of medical care, constant lockdowns, hygiene care that's just disgusting, a lack of access counsel and to the evidence in their cases, I can go and on," Federal Defenders Executive Director David Patton said. "And it hasn't mattered who the attorney general is, or who the director of the Bureau of Prisons is, they haven't been held accountable across administrations.").

The substandard conditions and continuous lockdowns, both at Essex and the MDC merit substantial leniency. "[A] day spent in prison under extreme lockdown …exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *United States v. McCrae,* 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021).

C. <u>A Time-Served Sentence is Necessary to Ensure that Mr. Cruz Receives Drug Treatment</u>

Third, a time-served sentence is necessary to ensure that Mr. Cruz receives necessary drug treatment. The nineteen months since Mr. Cruz's arrest have been among the most difficult in his life. The shock he experienced immediately following his arrest abated after a period only to be replaced by the shame and embarrassment of his conduct and the inevitable loneliness and depression that come with being detained. Though his detention has come at great cost to him personally, Mr. Cruz acknowledges that prison has served its purpose. He readily admits to using K2 several times upon admission to Essex but writes that he is "completely clean" now. Ex. B. "I

10

feel much healthier and stronger. I have lost weight and am able to walk much better. Now that I am at the MDC, I am taking all types of classes. My mind is also getting stronger. I am surrounded by so many different people and have no choice [but] to have patience." *Id.* These days Mr. Cruz spends his time on activities that improve his body and mind such as exercising and sewing. PSR ¶ 77. He has taken several classes at the MDC. *See* Ex. J. And he enjoys reading autobiographies of historical figures with triumphant life stories such as Malcolm X, Maya Angelou and Nelson Mandela.

Twenty months following his arrest, Mr. Cruz is on a path toward rehabilitation. The most reliable way of preventing him from reversing course is to require drug treatment as a condition of supervised release. Research consistently shows that drug treatment reduces both drug use and drug-related criminal behavior. *See* Redonna K. Chandler, Bennett W. Fletcher, Nora D. Volkow, *Treating Drug Abuse and Addiction in the Criminal Justice System: Improving Public Health and Safety*, JAMA. 2009 Jan 14; 301(2): 183–190, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2681083/ (explaining that a meta-analysis of 78 comparison-group community-based drug treatment studies found treatment to be up to 1.8 times better in reducing drug use than the usual alternatives).

Incarceration, by contrast, has little if any impact on drug crime. *See, e.g.,* Pew Charitable Trusts, *More Imprisonment Does Not Reduce State Drug Problems,* March 8, 2018, available at*:* https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2018/03/more-imprisonment-does-not-reduce-state-drug-problems, (citing 2017 study of federal and state corrections agencies, finding that "higher rates of drug imprisonment did not translate into lower rates of drug use, arrests, or overdose deaths."); *Treating Drug Abuse and Addiction* (explaining that "[a] review of recidivism in 15 states found that one-quarter of individuals released returned to prison

11

within 3 years for technical violations that included, among other things, testing positive for drug use"). In fact, despite the surge in federal prison spending since the 1980's, "[t]he rate of federal drug offenders who leave prison and are placed on community supervision but commit new crimes or violate the conditions of their release has been roughly a third for more than three decades." *More Imprisonment.*

Further, lower sentences do not result in higher recidivism rates. A 2014 study "found no increase in recidivism among offenders whose sentences were shortened [due to changes in the crack cocaine guidelines] compared with those whose were not." *More Imprisonment.*

Mr. Cruz needs drug treatment, and Dr. Bardey believes it is essential to prevent relapse and recidivism. Ex. A at 7. Admittedly, some BOP facilities do have drug treatment programs. But a lengthy sentence of incarceration would delay Mr. Cruz's access to the consistent, long-term care and counseling necessary to permanently manage his addiction.

D. A Two-Level Reduction is Warranted Under Guideline § 4C1.1

Fourth, leniency is warranted in light of Guideline § 4C1.1, which officially takes effect on November 1, 2023. Section 4C1.1 grants a two-level reduction to offenders with zero criminal history points who meet certain criteria, including: (1) the defendant did not receive a terrorism adjustment under Guideline § 3A1.4, (2) the defendant did not use violence or credible threats of violence in connection with the offense, (3) the offense did not result in death or serious bodily injury, (4) the offense is not a sex offense, (5) the defendant did not personally cause substantial financial hardship, (6) the defendant did not possess, receive, purchase, transport, transfer or sell a firearm in connection with the offense, (7) the offense is not covered by Guideline § 2H1.1, and (8) the defendant did not receive a hate crime or human rights offense adjournment under Guidelines §§ 3A1.1 or 3A1.5.

Mr. Cruz meets the above criteria. Accordingly, we respectfully request that the Court factor a two-level adjustment into its sentencing determination or delay his sentencing until November 1, 2023, so that he may benefit from the amendment.

E.  <u>A Time Served Sentence is Sufficient to Achieve General Deterrence</u>

Finally, the imposition of a lengthy sentence is unlikely to promote general deterrence. The empirical research clearly shows that increases in punishment do not yield substantial deterrent effects. "Law and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." National Institute of Justice, DOJ Office of Justice Programs, *Five Things About Deterrence* (June 2016); *see also* The Pew Charitable Trusts, *Time Served-The High Cost, Low Return of Longer Prison Terms* (June 2012), at 4 ("For a substantial number of offenders, there is little evidence that keeping them locked up longer prevents additional crime."); Sentencing Advisory Council, *Does Imprisonment Deter? A Review of the Evidence* (Apr. 2011), at 14 ("increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."). "[T]he chance of being caught is a vastly more effective deterrent than even draconian punishment." *Five Things About Deterrence*.

The advisory nature of the guidelines and discretion afforded federal judges further undermine the strength of a general deterrence argument. This is because no individual defendant is guaranteed the same result as the one who came before. In other words, even if Mr. Cruz is treated leniently, the next similarly situated offender cannot expect the same treatment.

Given the difficulty in a case like this of assessing the deterrent effect of a lengthy sentence over a sentence of time served, the goal of general deterrence should not outweigh the

other § 3553(a) factors, including Mr. Cruz's work history, conditions of confinement and drug addiction, each of which counsels in favor of leniency.

V.

**OBJECTION TO CONSIDERATION OF JUDICIARY SENTENCING INFORMATION**

JSIN provides aggregate statistics for individuals falling within a particular guidelines cell, but it is impossible to discern based on the data alone whether those individuals are similarly situated to the defendant being sentenced. Moreover, by excluding critical information, JSIN data skews the results higher than it should. JSIN does not include probationary sentences; it does not filter out mandatory minimum sentences; and sentences with 5K1.1 departures are excluded, even when the underlying conduct is arguably similar to the case at issue. Nor does JSIN's default report accurate average and median sentence lengths. Unless users opt to "Include Sentence Length Data," JSIN only includes prison sentences in its average/median statistics. It also accounts for time-served sentences differently than probationary sentences, treating the number of months served prior to a sentencing hearing as the total sentence intended by the judge, even where the judge would have imposed a lower or non-custodial sentence. Further, it relies on data that is not publicly available and limits itself to national results. It does not filter by district or circuit.

Considering the above, the inclusion of JSIN data in Mr. Cruz's PSR is both misleading and contrary to 18 U.S.C. § 3553(a)'s requirement that the Court conduct an individualized assessment of the case based on the facts presented. Accordingly, the data should be deleted from the PSR, and the Court should decline to consider it in making a sentencing determination.

## VI.

## CONCLUSION

For the reasons stated above, we ask the Court to impose a sentence of time served with a requirement of drug counseling.

New York, NY
September 26, 2023