

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 3, 2023

**BY ECF**

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:   *United States v. Luis Cruz*, 22 Cr. 92 (RA)

Dear Judge Abrams:

The Government respectfully submits this letter in advance of the sentencing of defendant Luis Cruz.  For the reasons explained below, the Government respectfully submits that a substantial term of incarceration—albeit, one below the Stipulated Guidelines Range of 108 to 135 months' imprisonment—of at least 72 months would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.   Background

### A.   Factual Background

This case arose from an investigation into the fentanyl-poisoning death of Michael K. Williams.  The investigation identified the defendant and his co-defendants as members of a drug trafficking organization (the "DTO") that sold heroin laced with fentanyl and a fentanyl analogue on the street in front of 224 South 3rd Street and from an apartment inside the apartment building located at 224 South 3rd Street (the "3rd Street Apartment"), among other places.  On September 5, 2021, Irvin Cartagena, one of the members of the DTO, sold Michael K. Williams heroin, which was laced with fentanyl and a fentanyl analogue.  Williams died as a result of using that fentanyl-laced heroin. Despite knowing that Williams died after being sold the DTO's product, the DTO continued to sell fentanyl-laced heroin, in broad daylight, amidst residential apartment buildings. (PSR ¶ 12).

#### 1.   The Overdose Death of Michael K. Williams

On September 6, 2021, the New York City Police Department ("NYPD") responded to a report of an unresponsive man at an apartment in the Williamsburg neighborhood of Brooklyn that was the residence of Michael K. Williams (the "Williams Apartment"). Williams was found dead at the scene. On a table in the Williams Apartment, NYPD observed what appeared to be narcotics and related paraphernalia. More specifically, the NYPD found, among other things: a white plate with white powdery residue on it, a straw on the plate, and several glassines that were marked with

the stamp "AAA Insurance" and scattered on and around the white plate. (PSR ¶ 18). Heroin, fentanyl, para-fluorofentanyl (a fentanyl analogue), and cocaine were detected in and around these materials. (PSR ¶¶ 19-22). Consistent with the drugs found at the scene, the medical examiner found that Williams died from acute intoxication by the combined effects of fentanyl, para-fluorofentanyl, heroin, and cocaine. (PSR ¶ 23).

2. <u>The September 5, 2021 Sale to Williams</u>

The day prior, Williams had purchased the glassines from co-defendant Irvin Cartagena in the vicinity of 224 South 3rd Street (the "3rd Street Apartment"). Surveillance video showed that Williams drove his car nearby, exited the vehicle, and walked to the vicinity of the 3rd Street Apartment in Williamsburg, where he encountered a group of individuals on the street, including Cartagena and the defendant. Williams engaged in conversation with the group, and one of the individuals placed his hand on Williams' shoulder. Williams appeared to speak with Cartagena, after which Cartagena walked around a row of trash cans in front of 224 South 3rd Street, retrieved what appears to be a plastic bag, reached inside the bag, appearing to remove an item, and, reaching over the trash cans, made a hand-to-hand exchange with Williams. (PSR ¶ 27). Following the exchange, Williams and Cartagena appeared to exchange numbers. (PSR ¶ 28). Thereafter, Williams returned to his car, drove back to the Williams Apartment, and never exited the building. The following day, Williams was found dead wearing the same clothing as shown on surveillance video. (PSR ¶ 29).

3. <u>Continued Trafficking of Fentanyl-Laced Heroin</u>

On numerous occasions following Williams's fatal overdose, which, because of Williams' fame, attracted significant media attention, all of the defendants— Cruz, Robles, Macci, and Cartagena—sold fentanyl-laced heroin to purchasers acting at the direction of law enforcement. They did so despite their awareness of Williams's overdose death. Indeed, despite knowing how dangerous their product was, the DTO, including the defendant, continued selling fentanyl-laced heroin on a regular basis in the vicinity of the 3rd Street Apartment.

For example, on or about September 7, 2021, a confidential informant acting at the direction of law enforcement purchased fentanyl-laced heroin from Cruz and Robles, and specifically asked whether the drugs were "same shit" that killed Michael K. Williams, because the informant did not "want to die." PSR ¶ 32. In response, Cruz told the informant, "what, what you think that it has . . . fentanyl and shit? We don't, don't fuck with that." *Id*. The parties then began discussing the police, and the informant told Cruz and Robles, "at least y'all were smart. Y'all changed the name," referring to the fact that the DTO had changed the stamp on their product following Williams' death. *Id*. In particular, the crew had begun selling glassines with a "Conoco Gas" stamp rather than the "AAA Insurance" stamp that had been on the glassines sold to Williams. (*See* Dkt. 1 (Compl.) ¶ 5(w)). Contrary to CRUZ's representation regarding fentanyl, the Conoco Gas glassines all contained fentanyl. (*Id.* ¶ 5(x)).

4.  Search of Cruz's Apartment

On February 1, 2022, the NYPD executed a search warrant at Cruz's apartments.  The officers recovered drug paraphernalia, including a scale with residue, and bundles of apparent heroin glassines stamped "Balmain Paris"—the stamp that the conspirators were using at that time.



The over-500 glassines recovered from Cruz's apartment on February 1 contained heroin and fentanyl.  Just three such glassines caused the death of Michael K. Williams.

**B.  Procedural Background**

On February 1, 2022, the defendant was arrested pursuant to a criminal complaint (the "Complaint") charging him with narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).  On February 10, 2022, the grand jury sitting in this District returned indictment 22 Cr. 92 (RA) charging the defendant with the same offense.  The defendant was not charged with distributing the drugs that caused Williams's death.

On April 13, 2023, the defendant pleaded guilty, pursuant to a plea agreement, to the lesser-included offense of narcotics conspiracy, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(B).

The PSR calculates a Guidelines range of 108 to 135 months' imprisonment, as also stipulated in the plea agreement.[1]  (PSR ¶ 89).  Probation recommends a sentence of 90 months' imprisonment.  (PSR at 27).  The defendant requests a sentence of time served.  (Dkt. 70).

---

[1] The defendant also requests that the Court account for a two-point reduction under Guidelines that take effect in November 2023.  (Dkt. 70 at 12-13).

## II.  Discussion

### A.  Section 3553(a) and the Guidelines

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49.

After determining the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range

will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

**B.  A Substantial Term of Incarceration of At Least 72 Months Is Warranted**

A substantial sentence of incarceration of at least 72 months would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, protect the community, and deter future criminal conduct of this defendant and others who could sell deadly narcotics in the community.  The need for deterrence and the need to protect the community are the paramount concerns calling for a substantial sentence for this defendant.

Cruz and his crew have been selling deadly narcotics for years: heroin laced with fentanyl. Fentanyl's toll on our communities has become so pervasive that it is difficult to comprehend. Overdose deaths in recent years increased markedly during the COVID-19 pandemic to unprecedented levels.[2]  Drug overdoses soared to more than 93,000 in 2020 alone, a then-all-time high, jumping nearly 30% since 2019, with fentanyl continuing to drive the death toll.[3]  The National Institutes of Health ("NIH") has documented the rise in overdose deaths caused by fentanyl.  In 2021, which is the most recent year per-drug data is available, fentanyl was the cause of 70,601 of the more than 106,000 drug overdose deaths in the United States.[4]  The following chart documents the extraordinary rise in overdose deaths attributed to fentanyl in recent years:



Figure 2. National Drug-Involved Overdose Deaths*, Number Among All Ages, 1999-2021

*Includes deaths with underlying causes of unintentional drug poisoning (X40–X44), suicide drug poisoning (X60–X64), homicide drug poisoning (X85), or drug poisoning of undetermined intent (Y10–Y14), as coded in the International Classification of Diseases, 10th Revision. Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2021 on CDC WONDER Online Database, released 1/2023.

---

[2] *See, e.g.*, Abby Goodnough, "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," N.Y. Times, https://nyti.ms/3pyYkyT (April 14, 2021).

[3] *See, e.g.,* Lenny Bernstein and Joel Achenbach, "Drug overdose deaths soared to a record 93,000 last year," Wash. Post., https://wapo.st/3xOX1zb (July 14, 2021).

[4] Available at: https://nida.nih.gov/drug-topics/trends-statistics/overdose-death-rates

The death of Michael K. Williams from the drugs sold by Cruz's crew—a tragic loss in itself—is one of hundreds of thousands of such tragedies across this country stemming from such drugs.

Notably, as reflected above, Cruz and his crew were aware that the drugs they distributed killed Williams. Yet Cruz and his conspirators were undeterred by the death of one of their customers and continued selling the same deadly product, including after a confidential informant specifically discussed Williams' death with Cruz. That loss of life should have been a "wake-up call" and changed Cruz's behavior. Instead, he just changed the "stamp" on the glassines, and continued selling the same dangerous drugs.

While the Government recognizes that Cruz's own struggles with addiction played a significant role in his involvement in drug dealing and, specifically, the conduct charged in this case, the effect that his conduct has had on the community at large cannot be ignored. Cruz and his co-defendants sold significant quantities of deadly drugs, day in and day out, on a residential block, inside of and in front of apartment buildings where families live. Indeed, one civilian even called 9-1-1 in August 2021 to report that that their child saw the heroin being sold from Cruz's apartment. No one should have their home turned into a drug market. Indeed, much as Cruz ignored the safety and displayed indifference to the lives of his customers, by selling dangerous drugs where people attempted to raise families, Cruz also made clear his contempt for his community.

Moreover, a sentence of at least 72 months' imprisonment would be in line with the other sentences the Court has imposed in this case. In terms of relative culpability, the Government views Cruz as less culpable than Irvin Cartagena (who sold the deadly dose to Williams) and received a sentence of 120 months' imprisonment, but more culpable than Carlos Macci, who had several mitigating factors (including his age and significant cognitive disabilities) that the Court considered, among other things, in imposing a sentence of 30 months' imprisonment. To be sure, both Macci and Cartagena had troubling criminal records, whereas Cruz has no prior criminal convictions. Nevertheless, given Cruz's involvement in selling these deadly drugs with his co-conspirators, the need to protect the public and promote respect for the law, and the other sentences imposed in this case, a sentence of at least 72 months' imprisonment would not create unwarranted sentencing disparities and would account for the sentencing factors described above.

## III.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial sentence of at least 72 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____/s/_____
Micah F. Fergenson / David J. Robles
Assistant United States Attorneys
(212) 637-2190 / -2550

Cc:  Deborah Colson, Esq. (By ECF)